**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| IN RE: Zicam Cold Remedy Marketing, Sales Practices, and Products Liability Litigation.<br><br>THIS DOCUMENT RELATES TO:<br><br>All Personal Injury Actions. | No. 09-md-2096-PHX-FJM<br><br>**ORDER** |

We have before us defendants' motion for summary judgment on the issue of general causation (doc. 1374), plaintiffs' response (doc. 1412), and defendants' reply (doc. 1426).[1]

**I. MDL Background**

Plaintiffs allege that their use of Zicam Cold Remedy Intranasal Gel Spray or Swabs caused them to lose their sense of smell. For a description of the Zicam intranasal products, see our Order on Defendants' Motion to Exclude Plaintiffs' Causation Experts ("Daubert Order") at 2–3 (doc. 1360).

Defendants moved to exclude the opinions of four of plaintiffs' experts, see Motion to Exclude Plaintiffs' General Causation Experts (doc. 1061); Motion to Exclude Plaintiffs'

---

[1] Defendants assert that the only plaintiffs with claims currently pending in this MDL are those who did not opt to participate in the global settlement of the personal injury actions. See Motion at 9; Notice of Settlement of Partial Withdraw of Motion for Summary Judgment (doc. 1412) (notifying court of settlement of three additional actions). However, the settled actions have yet to be dismissed.

1  Expert Jay Sirois (doc. 1063), which we granted in part and denied in part. We admitted Dr.
2  Greg Davis's opinions about (1) the diffuse location of olfactory tissue in the nose, and (2)
3  the toxicity of Zicam. Daubert Order at 19. We admitted Dr. Ashim Mitra's opinions about
4  (1) the distribution and deposition of Zicam within the nasal cavity, (2) the principle of
5  diffusion, and (3) the effect of the preservative benzalkonium chloride on the absorption of
6  Zicam. Id. at 23. We admitted Dr. Steven Pike's opinions about the toxicity of Zicam to
7  olfactory epithelium ("OE") and its potential to cause anosmia, but excluded his reliance on
8  certain studies. Id. at 28.[2]

## II.  Legal standards

We grant summary judgment if defendants show "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). We draw all justifiable inferences in favor of the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S.Ct. 2505, 2513 (1986).

Plaintiffs assert causes of action under the products liability laws of their respective states. In a products liability action brought in federal court pursuant to diversity jurisdiction, we apply state substantive law. Stilwell v. Smith & Nephew, Inc., 482 F.3d 1187, 1193 (9th Cir. 2007). As an MDL transferee court, we apply the substantive law of each transferor forum. Ferens v. John Deere Co., 494 U.S. 516, 525, 110 S.Ct. 1274, 1280 (1990) (choice-of-law rules do not change following a transfer). It is uncontested that each transferor forum applies the substantive law of the place where plaintiff resides, purchased the product, and was injured. See Motion at 15.

The parties also agree that each applicable state requires plaintiffs to prove general

---

[2] We excluded Dr. Davis's opinions about (1) the distribution of Zicam within the nasal cavity, and (2) the effectiveness of Zicam. We excluded Dr. Mitra's opinions about (1) Zicam's toxicity to the OE, (2) anosmia, and (3) Zicam's efficacy. We excluded Dr. Pike's reliance on the Charlton study, polio experiments, Dr. Davidson's case studies, and the Food and Drug Administration's ("FDA") Adverse Events Reporting System data and its analysis. We also admitted all opinions of Dr. Jay Sirois on the regulation and labeling of Zicam, except with respect to data and analysis from the FDA.

- 2 -

and specific causation for their claims for negligence, strict liability, failure to warn, breach of warranties, and consumer fraud. See Motion at 16. Plaintiffs must show a causal link between their alleged injury, anosmia, and their use of Zicam, the allegedly defective product. "General causation" means "whether the substance at issue had the capacity to cause the harm alleged." In re Hanford Nuclear Reservation Litigation, 292 F.3d 1124, 1133 (9th Cir. 2002). The general causation inquiry is "whether exposure to a substance for which a defendant is responsible . . . is capable of causing a particular injury or condition in the general population." Id. at 1133. Specific or individual causation "refers to whether a particular individual suffers from a particular ailment as a result of exposure to a substance." Id. Where the distinction between general and individual causation is made, "it must be strictly observed." Id. at 1135

Defendants move for summary judgment solely on the issue of general causation. They contend that we (and the transferor courts) need not reach the issue of specific causation unless plaintiffs' evidence is sufficient to show that anosmia can be caused by the circumstances of their exposure. Motion at 17 (citing Ruggiero v. Warner-Lambert Co., 424 F.3d 249, 254 (2d Cir. 2005)).

The admission of significant portions of plaintiffs' experts' opinions does not necessarily mean that the evidence is sufficient to support the general causation element of plaintiffs' claims. See Stilwell, 482 F.3d at 1195 (affirming grant of summary judgment because the inclusion of the rejected testimony of plaintiff's expert does not establish causation). Even where scientific evidence "meets the standards of Rule 702," summary judgment may be an "appropriate safeguard." Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 596, 113 S.Ct. 2786, 2798 (1993). "[P]roof of causation must be such as to suggest 'probability' rather than mere 'possibility,' precisely to guard against raw speculation by the fact-finder." Sakaria v. Trans World Airlines, 8 F.3d 164, 172–73 (4th Cir. 1993); see also Domingo ex rel. Domingo v. T.K., 289 F.3d 600, 607 (9th Cir. 2002) ("bits and pieces of testimony of defendants' experts could not give rise to a triable issue of causation."). However, as we noted in our Daubert Order, "[v]igorous cross-examination, presentation of

contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." Daubert, 509 U.S. at 596, 113 S.Ct. at 2798.

### III. The delivery of a toxic dose.

To defeat summary judgment, plaintiffs' collective expert opinions and evidence must be sufficient for a fact-finder to reliably conclude that ordinary use of Zicam can deliver zinc ions to the OE in an amount capable of damaging enough OE to cause smell loss in humans. Defendants contend that plaintiffs cannot meet their burden because: (1) evidence of the toxic level of Zicam is insufficient; (2) evidence of how much Zicam reaches the OE is insufficient; and (3) evidence of the location of smell tissue is speculative.

**A.  Toxic level of Zicam**

**1.  Is a showing of a toxic dose required?**

Defendants contend that plaintiffs cannot meet their causation burden because they have not demonstrated how much Zicam (or zinc) exposure is necessary to cause smell loss. Motion at 13. Plaintiffs argue they need not prove a "toxic dose," but rather must simply demonstrate a "causal relationship between the defect and the injury." Response at 15. We therefore first determine whether plaintiffs must introduce evidence of the level of exposure that could cause anosmia, i.e. whether they must demonstrate a toxic dose.

A central tenet of toxicology is "'the dose makes the poison'; this implies that all chemical agents are intrinsically hazardous—whether they cause harm is only a question of dose." Fed. Judicial Ctr., Reference Manual on Scientific Evidence at 403 (2d. ed. 2000). An "important component of toxicological research is dose–response relationships." Id. at 406. This is the concept "that the more intense the exposure, the greater the risk of disease." Id. at 377. Some causal agents do not exhibit a dose–response relationship. For example, exposure may not cause disease until it exceeds a certain dose. "Thus, a dose–response relationship is strong, but not essential, evidence that the relationship between an agent and disease is causal." Id.

However, while a Zicam dose-response relationship may exist, determining the toxic

- 4 -

1  dose of a drug is challenging. Drugs, in contrast to toxins, are intended to be ingested. We
2  do not require studies on "living humans with intact physiology and operative metabolic and
3  immune function" to demonstrate "the amount needed to destroy a sufficient amount of OE
4  to compromise smell function." See Motion at 20. While this sort of study might be helpful
5  to a trier of fact, it presents significant ethical problems. See Daubert Order at 14 (citing
6  Reference Manual at 405).

7        Given the challenge of determining a toxic dose, and plaintiffs' concession that they
8  have not done so, the issue is whether this failure entitles defendants to summary judgment
9  on general causation. Related to this question is the parties' disagreement about whether
10 plaintiffs' actions arise under the law of "products liability" or "toxic tort." See Response
11 at 13; Reply at 9. Clearly, there is some overlap between toxic tort and products liability
12 litigation in actions where plaintiffs allege that a product's defect is its chemical toxicity to
13 humans. See, e.g. McClain v. Metabolife Intern., Inc., 401 F.3d 1233, 1239 (11th Cir. 2005)
14 (classifying personal injury actions arising from pharmaceutical use as kind of toxic tort case
15 in which the medical community does not generally recognize toxicity of agent); see also
16 Leathers v. Pfizer, Inc., 233 F.R.D. 687, 690 (N.D. Ga. 2006). However, the relationship
17 between toxic tort and products liability law is not exactly the issue before us. The issue is
18 whether the toxic dose showing required in environmental exposure actions is applicable to
19 products liability claims for allegedly toxic drugs.

20       Defendants cite a lengthy list of cases in support of their argument that products
21 liability claims about the toxicity of drugs require evidence of a toxic dose. See Reply at 15.
22 However, only two of these decisions involve medicine. First, in McClain v. Metabolife
23 Intern., Inc., 401 F.3d 1233, 1236 (11th Cir. 2005), plaintiffs alleged they sustained "serious
24 injuries after taking Metabolife 356, an herbal appetite suppressant containing ephedrine and
25 caffeine." The court categorized the action as a toxic tort case in which the medical
26 community does not "generally recognize the agent as both toxic and causing the injury
27 plaintiff alleges," as distinguished from actions involving known toxins like asbestos and
28 cigarette smoke. Id. at 1239. The court excluded a scientific expert's opinion in part because

he could not "provide any opinions about the general dose-response levels for Metabolife's toxicity." Id. at 1241. In toxic tort cases, the court concluded, "scientific knowledge of the harmful level of exposure to a chemical is a minimal fact necessary to sustain plaintiff's burden," and "a plaintiff must demonstrate the levels of exposure that are hazardous to human beings generally as well as the plaintiff's actual level of exposure to the defendant's toxic substance before he or she may recover." Id.

In so concluding, the McClain court did not cite any drug or pharmaceutical cases, but instead relied on environmental exposure decisions. See McClain, 401 F.3d at 1241 (citing Allen v. Pennsylvania Eng'g Corp., 102 F.3d 194 (5th Cir. 1996) (exposure to chemicals used in hospital where plaintiff worked); Mitchell v. Gencorp, 165 F.3d 778 (10th Cir. 1999) (exposure to chemicals in "flammable room" at work); Wright v. Willamette Industries, Inc., 91 F.3d 1105 (8th Cir. 1996) (exposure to particulate emissions from fiberboard manufacturing plant); Moore v. Ashland Chem. Inc., 151 F.3d 269 (5th Cir. 1998) (exposure to chemicals spilled from leaking drums plaintiff delivered)).

Defendants also cite In re Bextra & Celebrex Mktg. Sales Practices & Prod. Liab. Litigation, 524 F. Supp. 2d 1166 (N.D. Cal. 2007), in which over 3,000 plaintiffs alleged that they (or their family members) suffered cardiovascular injuries as a result of taking Celebrex, a pain medication. The court stated that "[a]ll of plaintiffs' experts, with perhaps a single exception, agree that there is a dose effect with Celebrex; that is, that it is more toxic, and is therefore more likely to cause an adverse side effect, when taken at greater doses." Id. at 1174. In deciding to evaluate plaintiffs' causation experts' opinions on the 200 milligram dose separately from their opinions about the 400 milligram dose, the court relied on environmental exposure cases requiring a showing of the toxic exposure level. Id. at 1174–75 (citing Mitchell, 165 F.3d at 781; Allen, 102 F.3d at 199; Hanford, 292 F.3d at 1133 (exposure to radioactive emissions from nuclear facility)). The court then concluded that there was insufficient evidence of causation of adverse events from Celebrex at the 200 milligram dose or less. Id. at 1175.

Insofar as McClain and Bextra applied the "toxic dose" requirement from

environmental exposure litigation to drug products liability actions, they appear to be unique. Defendants cite no other cases involving pharmaceuticals; the remaining cases on which they rely are environmental exposure cases that do not involve drug products. See Motion at 17; Reply at 14; Mitchell, 165 F.3d 778 (chemicals in "flammable room"); Abaun v. General Elec. Co., 3 F.3d 329 (9th Cir. 1993) (exposure to PCBs and other chemicals); Dee v. PCS Property Management, Inc., 174 Cal.App.4th 390, 94 Cal.Rptr.3d 456 (App. 2009) (tenant's exposure to toxins from fungus in apartment); McGonnell v. Kaiser Gypsum Co., 98 Cal.App.4th 1098, 120 Cal.Rptr.2d 23 (2002) (asbestos exposure); Parker v. Brush Wellman, 2010 WL 3730924 (N.D. Ga. 2010) (exposure to beryllium); Higgins v. Diversey Corp., 998 F. Supp. 598 (D. Md. 1997) (inhalation of powdered bleach); Bonner v. ISP Techs., Inc., 259 F.3d 924 (8th Cir. 2001) (factory employee's exposure to solvent); Parker v. Mobil Oil Corp., 7 N.Y. 3d 434 (Ct. App. 2006) (exposure to benzene in gasoline); Coratti v. Wella Corp., 831 N.Y.S.2d 358 (2006) (hair dresser exposed to hair dye); Abraham v. Union Pac. R. Co., 233 S.W.3d 13 (Tex.App. 2007) (railroad employees' exposure to creosote in railroad ties); Mascarenas v. Miles, Inc., 986 F. Supp. 582 (W.D. Mo. 1997) (exposure to pesticide); Alder v. Bayer Corp., 61 P.3d 1068 (Utah 2002) (hospital technicians' exposure to x-ray machine); Norfolk S. Ry v. Rogers, 621 S.E.2d 59 (Va. 2005) (exposure to asbestos and silica); Buzzerd v. Flagship Carwash of Port St. Lucie, Inc., 397 Fed. Appx. 797 (3d Cir. 2010) (carbon monoxide exposure); Austin v. Kerr-McGee Refining Corp., 25 S.W.3d 280 (Tex.App. 2000) (exposure to benzene); McNeel v. Union Pac. R.Co., 276 Neb. 143, 753 N.W.2d 321 (2008) (railroad conductor inhaled fumes); Clark v. Kellogg Brown & Root LLC, 2011 WL 386787 (5th Cir. 2011) (unpublished) (seaman's exposure to benzene); Korte v. ExxonMobil Coal USA, Inc., 164 Fed. Appx. 553 (7th Cir. 2006) (unpublished) (exposure to dust from coal mine); Wintz v. Northrup Corp., 110 F.3d 508 (7th Cir. 1997) (in utero exposure to bromide in photographic developing material used by mother); Gass v. Marriott Hotel Servs., Inc., 501 F. Supp. 2d 1011 (W.D. Mich. 2007) (exposure to pest control spray in hotel room).

In addition, other courts considering environmental exposure claims have concluded

that while "precise information concerning the exposure necessary to cause specific harm is beneficial, such evidence is not always available, or necessary, to demonstrate that a substance is toxic." Clausen v. M/V NEW CARISSA, 339 F.3d 1049, 1059–60 (9th Cir. 2003) (internal citations omitted) (oyster death caused by oil spill). Plaintiffs need not show a "mathematically precise table equating levels of exposure with levels of harm." Wright, 91 F.3d at 1107 (exposure to particulate emissions from fiberboard plant); see also Heller v. Shaw Industries, Inc., 167 F.3d 146, 154 (3d Cir. 1999) ("if a person were doused with chemical X and immediately thereafter developed symptom Y, the need for published literature showing a correlation between the two may be lessened.").

In contrast to Bextra, other courts reviewing drug product defect claims have not required evidence of a toxic dose. See, e.g., McClellan v. I-Flow Corp., 710 F. Supp. 2d 1092, 1111 (D. Or. 2010) ("While plaintiffs' experts cannot identify the precise threshold dose of bupivacaine or the length of exposure that triggers irreparable chondrocyte damage, 'Daubert does not require that every aspect of a theory of medical causation be supported by research on the identical point.'" (quoting Domingo, 289 F.3d at 607)); In re Avandia Marketing, Sales Practices and Products Liability Litigation, 2011 WL 13576 (E.D. Pa. 2011) (denying motion to exclude plaintiffs' general causation experts' opinion about causal connection between Avandia and myocardial infarction without discussion of toxic dose); Bartlett v. Mutual Pharmaceutical Company, Inc., 760 F. Supp. 2d 220 (D.N.H. 2011) (denying motion for judgment as a matter of law because plaintiff presented sufficient evidence that drug's risks outweighed its benefits without discussion of toxic dose); In re Fosamax Products Liability Litigation, 645 F. Supp. 2d 164 (S.D.N.Y. 2009) (denying motion to exclude plaintiffs' general causation experts' opinion that drug can cause osteonecrosis of the jaw without requiring demonstration of toxic dose); In re Neurontin Marketing, Sales Practices, and Products Liability Litigation, 612 F. Supp. 2d 116 (D. Mass. 2009) (denying motion to exclude plaintiffs' general causation experts' opinion that Neurontin can increase risk of suicide without determination of dose-response relationship). These cases considered contentions that the drugs could cause the harm alleged without

- 8 -

discussion of the level of exposure that could be toxic.

That the toxic dose issue does not arise more frequently in the drug products liability context makes sense. Toxicology and pharmacology are distinct disciplines. Reference Manual at 403. In environmental exposure litigation, plaintiffs may allege injury caused by a substance with which many people interact harmlessly at lesser degrees of exposure. In order to explain how a pervasive substance is harmful, one must show that at a particular level of exposure, the substance becomes toxic. Without requiring this kind of evidence, the door is open to meritless claims based on generally harmless levels of exposure. But that risk is less severe in drug product liability actions. Unlike, for example, the allegation that dust emissions from a factory caused injury, plaintiffs allege anosmia caused by a metered dose of Zicam that they injected directly into their bodies. The level of exposure will be mostly the same for all plaintiffs, and is easily distinguished from the general population's level of zinc gluconate nasal ingestion (i.e., none).

Having considered the limited precedent and the relevant practical concerns, we conclude that to establish general causation, plaintiffs need not prove a toxic dosage of Zicam. Instead, plaintiffs must demonstrate Zicam "is toxic to humans given substantial exposure." Westberry v. Gislaved Gummi AB, 178 F.3d 257, 264 (4th Cir. 1999) (citations omitted). Plaintiffs need not provide "precise information concerning the exposure necessary to cause specific harm to humans." Id. Rather, they must put forth sufficient evidence from which a reasonable person could conclude that it is more probable than not that Zicam caused their anosmia. A qualitative, rather than quantitative, analysis can suffice.

**2. Have plaintiffs provided sufficient evidence of toxicity?**

The issue before us then is whether the opinions of plaintiffs' experts are sufficient to show that Zicam can be toxic at a level of exposure similar to that which plaintiffs experienced.[3] We admitted the toxicity opinions of Dr. Davis and Dr. Pike. In doing so, we

---

[3] For purposes of general causation, we assume that each plaintiff's exposure was one dose of Zicam, per the package's directions.

- 9 -

found their reliance on studies by Jae H. Lim and Sanja Pavlica to be methodologically sound. Daubert Order at 16.

We denied defendants' motion to exclude Dr. Davis's toxicity opinion even though he does not know exactly how much OE must be compromised to produce smell dysfunction. Dr. Davis's lack of knowledge of the exact amount of OE damage necessary to cause smell dysfunction does not undermine the reliability of his testimony. Every step of a theory of causation need not be supported by research on the identical point. See Daubert Order at 18 (citing Domingo, 289 F.3d at 607). Dr. Davis's opinion may be properly considered by a jury, and contributes to the sufficiency of plaintiffs' evidence of causation.

We admitted Dr. Pike's opinion about the toxicity of Zicam to OE and the drug's potential to cause anosmia. Specifically, we permitted Dr. Pike's reliance on *in vitro* studies of Zicam's toxicity to OE for his conclusion that above "300 micromolar (0.3 mM) concentration all zinc salts are toxic to olfactory cells," and that the zinc gluconate concentration in Zicam is 100% higher than that level. Daubert Order at 27; Pike Report at 15 (doc. 1067-10). Defendants argue that Dr. Pike's opinion about the amount of zinc in zinc gluconate that can kill an OE cell is insufficient because it is based on an *in vitro* cytotoxicity study. Motion at 20. According to defendants, because the *in vitro* studies "involve the interaction of the chemical only with isolated cells, this study sheds no light whatsoever on causation of any specific medical condition in living humans with intact physiology and operative metabolic and immune function." Id. In their Daubert motion, defendants similarly argued that *in vitro* studies could not form the basis of general causation conclusions, because they do not account for human physiology and the zinc-tissue cell relationship. See Motion to Exclude Causation Experts at 29.

We do not agree that there is no basis to extrapolate from the amount of zinc capable of killing isolated cells to the amount necessary to cause anosmia. While *in vitro* evidence may not prove the exact level of exposure necessary for a human to lose the sense of smell, that level of precision is not necessary. As we concluded in our Daubert Order, "a lack of knowledge as to the exact amount of OE damage necessary to cause smell dysfunction does

- 10 -

1  not necessarily render Dr. Pike's opinions about Zicam's toxicity unreliable." Daubert Order
2  at 28. We further conclude that such evidence creates an issue of material fact about Zicam's
3  ability to destroy a person's OE at a given level of exposure.
4       Plaintiffs need not establish the toxic dose of Zicam. Plaintiffs' evidence of toxicity
5  is sufficient to create a material issue of fact regarding general causation.

**B. Distribution and reach of Zicam in the nasal cavity**

7       Defendants contend that there "is no non-speculative evidence in the record that
8  Zicam reaches the OE in a sufficient dose to cause smell dysfunction under conditions of
9  normal use." Motion at 18. We admitted the opinions of Dr. Mitra and Dr. Pike on the
10 distribution of Zicam within the nasal cavity.
11      We admitted Dr. Mitra's opinion about "the distribution and deposition of the Zicam
12 gel and zinc ions within the nasal cavity," concluding that his opinion that positively charged
13 zinc ions disassociate from the zinc gluconate in Zicam after the gel enters the body is
14 reliable. Daubert Order at 21. We further found reliable his opinion that zinc ions reach the
15 "olfactory mucosa present in the posterior area of medial turbinate due to capillary action,
16 postural effects and sniffing." Id. at 22. Defendants argue that Dr. Mitra's diffusion opinion
17 is insufficient because there is no evidence of how much zinc will reach the OE. Motion at
18 19. They claim there is no evidence beyond Dr. Mitra's "bare opinion" that any measurable
19 amount of Zicam will "overcome the forces of gravity, mucociliary clearance and absorption
20 into the nasal mucosa and ultimately the bloodstream" to make it to the OE. Motion at 19.
21      Despite Dr. Mitra's admission that he does not know exactly how much zinc will
22 reach the OE through diffusion, his opinion still helps to create a genuine dispute about
23 material facts. To show that Zicam is capable of causing anosmia, plaintiffs must explain
24 how Zicam, or disassociated zinc, could reach a plaintiff's smell tissue. Dr. Mitra's theory
25 applying the well-established principle of diffusion may properly contribute to the
26 sufficiency of plaintiffs' case on this point. Its significance is not wholly dependant on
27 plaintiffs' ability to prove the exact amount of zinc that reaches the OE. Defendants'
28 questions about the rate of substance dispersion, clearance and absorption, and how much

- 11 -

OE would interact with zinc may be explored on cross-examination and through defendants' expert testimony. See Daubert Order at 22.

We also admitted Dr. Pike's opinion that disassociated zinc ions can reach the OE because of differences in the electronegativity of the nose and mouth. See Daubert Order at 26. Over defendants' objection that Dr. Pike's theory was untested and unproved, we concluded it was a reliable extrapolation and therefore admissible. Id. As with Dr. Mitra's opinion, Dr. Pike's opinion supports plaintiffs' case that Zicam can reach smell tissue.

Defendants additionally argue that several studies involving dyed Zicam show no significant diffusion and that the gel is cleared through the nasal passage. Motion at 21 (citing Jesus Herranz Gonzalez-Botas et al., Anatomical Distribution and Transport of a Topical Liquid Nasal Gel, 57 Acta Otorringolaringol Esp. 130 (2006) (doc. 1068-10); Jesus Herranz Gonzalez-Botas et al., Study to Determine the Distribution Pattern of a Nasal Gel Using a Radial Design Nasal Actuator (2010) (unpublished) (sealed) (doc. 1068-9)). However, contradiction between plaintiffs' methodologically sound theories and defendants' evidence does not entitle defendants to summary judgment. Plaintiffs' reliable theories about the distribution of Zicam create a material factual dispute about the reach of the drug in the nasal cavity. The significance of conflicting research may be explored through defendants' cross-examination of plaintiffs' experts. Daubert Order at 19.

It is also not dispositive that plaintiffs have not offered evidence of the amount of Zicam or zinc that can reach the OE through diffusion, electro-osmosis, or other mechanisms. See Motion at 23. Plaintiffs must provide "sufficiently compelling proof that the event must have caused the damage somehow." Domingo, 289 F.3d at 607 (citing Daubert v. Merrell Dow Pharmaceuticals, Inc., 43 F.3d 1311, 1314 (9th Cir. 1995) ("Daubert II")). However, we do not require that "every aspect of a theory of medical causation be supported by research on the identical point." Id. The absence of studies on exactly how much Zicam may move through the nasal cavity does not render plaintiffs' theories insufficient.

In support of their experts' opinions about the distribution of Zicam, plaintiffs also point to the Zicam patent and the deposition testimony of defendants' experts. See Response

1  at 17–18. According to the patent, the product "maintains ionic zinc in direct contact with
2  the nasal membrane, preferably for an extended period of time of at least one-quarter hour,
3  and delivers rapidly zinc into the nasal membrane and into blood in the nasal membrane."
4  Daubert Response, ex. 5, "U.S. Patent 6,080,783" at 32 (doc. 1231-2). In addition, as we
5  noted in our Daubert Order, two of defendants' experts agree that some diffusion of zinc ions
6  is likely and it is plausible that zinc could reach the OE. Daubert Order at 22 (citing Dalby
7  Deposition at 88 (doc. 1278-1); Schwob Deposition at 61 (doc. 1231-2)). We agree that the
8  patent and the opinions of several of defendants' experts bolster plaintiffs' showing that
9  Zicam can reach the OE.

10  We conclude that plaintiffs' expert opinions about the reach of Zicam and zinc within
11  the nasal cavity contribute to the sufficiency of plaintiffs' evidence that the product can cause
12  anosmia.

**C. Location of OE**

14  We admitted Dr. Davis's opinion that OE is located diffusely through the nasal cavity.
15  Daubert Order at 8. We concluded that although Dr. Davis's theory is not the majority view,
16  it is based on valid scientific methodology. Defendants argue that because Dr. Davis does
17  not know how much OE is located in particular regions of the nasal cavity, or how much
18  must be compromised to produce smell loss, Dr. Davis's theory is speculative and
19  insufficient to prove causation. Motion at 23. We addressed this contention and concluded
20  that even though more precise information about the location of OE and the amount that must
21  be destroyed to cause anosmia is not yet available, Dr. Davis's theory may still be helpful to
22  a jury. Daubert Order at 9 (citing Clausen, 339 F.3d at 1059–60).

23  For the same reason, we conclude that the theory supports the sufficiency of plaintiffs'
24  case on causation. In conjunction with plaintiffs' expert testimony about the toxicity and
25  reach of Zicam, Dr. Davis's opinion about the location of the OE may support a trier of fact's
26  finding that it is scientifically possible for Zicam to have caused a plaintiff's anosmia.

27  In sum, we conclude that the totality of plaintiffs' evidence regarding the toxicity of
28  Zicam, the distribution and deposition of Zicam and zinc in the nasal cavity, and the location

of OE, is sufficient to create a triable issue of fact as to whether Zicam can cause anosmia. A reasonable fact-finder could conclude that ordinary use of Zicam can cause plaintiffs' alleged injuries. Therefore, defendants are not entitled to summary judgment on the issue of general causation.

## IV. Differential diagnosis

Plaintiffs argue that even in the absence of any expert testimony on causation, they may rely on differential diagnosis or the immediate onset of symptoms following exposure to establish causation, and therefore, defendants are not entitled to summary judgment. Response at 20. Because we conclude that plaintiffs' expert opinions and evidence are sufficient to create a triable issue of fact on causation, we need not reach plaintiffs' alternative contention.

## V. Conclusion

**IT IS ORDERED DENYING** defendants' motion for summary judgment (doc. 1374).

DATED this 2nd day of June, 2011.

*Frederick J. Martone*
Frederick J. Martone
United States District Judge